UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

| | | |
|---|---|---|
| CARLOS HARRIS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 2:22-CV-131-REW-MAS |
| v. | ) | |
| | ) | |
| JAMES DAVID GREEN, | ) | OPINION & ORDER |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

On October 24, 2022, Carlos Harris, proceeding *pro se*, filed a petition under 28 U.S.C.

§ 2254 for a Writ of Habeas Corpus. *See* DE 1 (Petition). Harris moves the Court to vacate his

Kentucky intentional murder conviction. *See id.* at 1. On August 28, 2023, United States

Magistrate Judge Matthew A. Stinnett, on standing referral, reviewed the record and recommended

that Harris's petition be dismissed because "it is severely untimely." *See* DE 37 at 4 (Report and

Recommendation). Judge Stinnett also found an evidentiary hearing unnecessary and

recommended that no certificate of appealability issue. *See id.* at 16–18. Harris objected to Judge

Stinnett's report and recommendation. *See* DE 39. The Commonwealth responded, *see* DE 42, and

Harris replied, *see* DE 43. The matter is ripe for review.

## I.    Background

On October 1, 1999, Carlos Harris was indicted for the May 19, 1999 intentional murder

of Jualana Kirtley. *Harris v. Commonwealth*, No. 2006-CA-002284-MR, 2008 WL 1917592, at

\*1 (Ky. Ct. App. May 2, 2008) (*Harris I*).  A state jury convicted Harris of intentional murder,

and the Kenton Circuit Court sentenced him to life imprisonment. *See id.* The Kentucky Supreme

1

Court fully rehearsed the facts from the night of Ms. Kirtley's death, when a consensual sexual encounter with Harris led to disagreement between the two and a physical altercation that took Ms. Kirtley's life. In February 2000, Harris filed a direct appeal to the Kentucky Supreme Court, which affirmed the conviction in 2002. *See Harris v. Commonwealth*, No. 2000-SC-0137-MR (Ky. 2002) (*Harris II,* DE 26-1 at 129–35). The United States Supreme Court denied Harris's petition for a writ of certiorari. *See Harris v. Kentucky*, 123 S. Ct. 316 (2002). The denial occurred on October 7, 2002. *See id.*; DE 26-1 at 136).

Harris has initiated several rounds of post-conviction litigation, only generally summarized here. On July 9, 2004, twenty months after cert. denial, Harris filed a motion, *pro se*, to vacate, set aside or correct his sentence pursuant to Kentucky RCr 11.42. *See Harris I*, 2008 WL 1917592, at *1. He alleged that his trial counsel was ineffective for failing to give proper notice of intent to call an expert witness at his trial. *See id*. The trial court denied his motion, and the Kentucky Court of Appeals affirmed this decision in 2008. *See id*. at *3.

Seven years later, Harris filed a motion, *pro se*, to vacate pursuant to Kentucky CR 60.02(e) and Kentucky RCr 10.01. *See Harris II*, 2017 WL 2210743, at *1. In his motion, Harris "alleged 'actual innocence,' that Dr. [Charles] Stephens[, a forensic pathologist and expert for the Commonwealth,] fixed his autopsy results to support the Commonwealth's theory of the case, and that the evidence was otherwise insufficient to prove intent to support the conviction for intentional murder." *Id*. The trial court denied Harris's motion as untimely and as an improperly successive motion. *Id*. The Kentucky Court of Appeals agreed and affirmed the trial court's denial. *Id*. at *3.

Harris filed two subsequent motions pursuant to CR 60.02(e). *See* DE 37 at 3–4. Those, again, the trial court denied for procedural reasons, and Harris either did not appeal or failed procedurally to initiate appeal.

This brought Harris to federal court, where he filed the instant § 2254 motion seeking to vacate his conviction. *See* DE 1 (Petition). Harris asserted a long list of claims or sub-claims including allegations of: (1) actual innocence based on new and reliable scientific evidence undermining the Commonwealth's theory of the victim's cause of death; (2) a *Brady* violation committed by the prosecution relating to administrative papers regarding the medical examiner's report; (3) perjury committed by a prosecution witness; (4) and (5) ineffective assistance of trial counsel (pre-trial and during trial); (6) an erroneous jury instruction that omitted an essential element; (7) improper jury polling at the end of the trial; and (8) ineffective assistance of appellate counsel. *See* DE 1. The Commonwealth responded. *See* DE 26 (Response). Harris replied. *See* DE 30 (Reply). Harris also filed a petition to supplement or amend his § 2254. On August 28, 2023, Judge Stinnett recommended that the Court deny Harris's § 2254 petition as "severely untimely." *See* DE 37 at 4. Harris's objections to that ruling (at DE 39) are now before the Court.

Judge Stinnett viewed all claims as time-barred, absent access to the *Schlup* gateway. He determined that Harris did not have "new" evidence and that Harris's proof otherwise did not satisfy the demanding *Schlup* standard. Judge Stinnett, on the Brady merits, found no violation based on Harris's alternative access and lack of materiality. Harris purports to object to Judge Stinnett's decision in its entirety.

The Court largely agrees with Judge Stinnett, though in some ways on different grounds. The Sixth Circuit would treat Dr. Young's opinion and the autopsy form as "new" because they were not presented at trial. However, Judge Stinnett correctly determined that the proof, even if brough to bear at trial, would not cross the demanding *Schlup* bar. The *Brady* claim, alternatively and as a substantive theory, is one Harris procedurally defaulted, even if it would not otherwise be time-barred. The Court sees no excuse for the default, but in any event, agrees with Judge Stinnett

on the merits.  Because the *Schlup* gateway does not open on this record, all of the substantive claims clearly are barred by limitations.  The Court **DENIES** Harris's motion, DE 1.

## II.    Legal Framework

The Court reviews Judge Stinnett's recommendation, as to objections, de novo.  *See* 28 U.S.C. § 636(b)(1)(C) (requiring "a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made").  However, the Court need not conduct "review of a magistrate[] [judge's] factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings."  *Thomas v. Arn*, 106 S. Ct. 466, 472 (1985).  The Court tailors its analysis accordingly.  Harris takes issue not with Judge Stinnett's identification and summary of the legal standards but with the application in this case, so the Court affords full scrutiny to the recommendation and its analysis.

Because Harris's federal filing, by any measure, came well beyond the AEDPA's limitations period, Judge Stinnett focused much discussion on timeliness.  Even Harris admitted his "petition was filed 19 years untimely," DE 39 at 18, and he relies on the "actual innocence gateway" to create a pathway to substantive consideration. *Id.*

Generally, under the AEDPA, a petitioner has one year to file a petition for a writ of habeas corpus.  *See* 28 U.S.C. § 2244(d).  The AEDPA states:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
(B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
(C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized

4

by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)      the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Id*.  Principally relevant here is 28 U.S.C. § 2244(d)(1).  Harris's conviction became final on October 7, 2022, when the Supreme Court denied his petition for a writ of certiorari. *See Harris v. Kentucky*, 123 S. Ct. 316 (2002).  As Judge Stinnett found, Harris had until October 7, 2003 to timely file his § 2254 petition.  Although Harris began some broken efforts at post-conviction relief in July of 2004, that first effort was some ten months past the deadline, so Harris gets no beneficial tolling there under (d)(2).  Simply put, as a straight § 2244 proposition, the petition is not timely.[1]

The case distills almost completely to whether Harris can usher claims otherwise barred through the *Schlup* gateway.  The answer is no.

## III.   Analysis

### a.  The *Schlup* Gateway

Harris does not argue traditional equitable tolling.  Rather, he seeks passage through the actual innocence gateway articulated in *Schlup v. Delo*, 115 S. Ct. 851, 865–66 (1995).  As the Sixth Circuit most recently stated in *McCray v. Tanner*, 2024 WL 3443413, at *9 (6th Cir. July 17, 2024):

> The "actual-innocence" standard that McCray must satisfy here is among the most demanding in federal law. McCray wants the district court to adjudicate his underlying habeas petition, which everyone agrees is untimely. And a district court may consider an untimely habeas petition only if the petitioner shows that, "more likely than not, in light of the new evidence, *no reasonable juror* would find him guilty beyond a reasonable doubt[.]" *House v. Bell*, 547 U.S. 518, 538 (2006) (emphasis added); *see also Schlup*, 513 U.S. at 321, 327. When making that determination, the court must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (cleaned up); *Keith v. Hill*, 78 F.4th 307, 315 (6th Cir. 2023).

---

[1] As to the *Brady* claim, (d)(1)(D) could apply, but as later noted, Harris defaulted that claim before the state court.

*Id.* Upon review, Judge Stinnett found Harris failed to meet this burden, as the evidence he cited "is neither newly discovered nor does it persuade the Court that it is more likely than not that if presented at trial . . . no reasonable juror would have convicted Harris." *See* DE 37 at 9–10.

In *Souter v. Jones*, the Sixth Circuit discussed how a claim of actual innocence can result in equitable tolling:

> The United States Supreme Court has held that a claim of actual innocence can be raised to "avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326-27, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the  merits of an otherwise procedurally-barred habeas petition. *Schlup*, 513 U.S. at 317, 115 S.Ct. 851. The actual innocence claim in *Schlup* is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315, 115 S.Ct. 851 (citing *Herrera v. Collins*, 506 U.S. 390, 404, 113 S.Ct. 853, 112 L.Ed.2d 203 (1993)).

395 F.3d 577, 588–89 (6th Cir. 2005).[2] A petitioner must show that it is "more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 115 S. Ct. at 867. A credible claim requires that a petitioner present new, reliable evidence that was not presented at trial. *Id.* at 865 (listing "exculpatory scientific evidence, trustworthy eyewitness

---

[2] The Commonwealth argues procedural default on actual innocence.  Harris disclaimed any standalone or substantive theory.  *See* DE 30 at 11.  Thus, actual innocence is not here a claim but rather a procedural vehicle in federal court for potential consideration of other, otherwise defaulted claims.  A *Schlup* "claim" is really no claim at all, "but is instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claims considered on the merits." *See Gibbs v. United States*, 655 F.3d 473, 477 (6th Cir. 2011); *Herrera v. Collins*, 113 S. Ct. 853, 863 (1993). Indeed, the Supreme Court has conceived of it as as a "plea" rather than a "claim." *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013). Thus, because the *Schlup* gateway, if proven, only avoids the federal court's procedural bar to considering the substantive merits of a petitioner's constitutional claims, *see Schlup*, 115 S. Ct. at 867, there is nothing substantive to exhaust at the state level. Rather, the determination of whether a petitioner's newly presented evidence satisfies *Schlup*'s exacting standard is a procedural endeavor tasked to the federal court.

accounts, or critical physical evidence" as examples).   Relief exists only in rare and extraordinary cases.  *See id.* at 853.

Parting with Judge Stinnett, the Court does see evidence that qualifies as "new."  Harris secured an expert (Dr. Young), many years after the trial, who examined records Harris provided and issued an opinion.  This appears at DE 26-2 at 375–76.  Dr. Young compares Harris's various statements with the autopsy, critiques the autopsy result, and offers that Kirtley could have died from cardiac arrest "brought about by the struggle."  Dr. Young has generic criticisms of Dr. Stephens's methodology and some of his conclusions.  Further, Harris secured a post-mortem authorization document (DE 26-2 at 404) through an open records request twenty years after trial. He claims this is new proof indicative of Ms. Kirtley's time of death.

Though the Commonwealth argues, e.g., that Young is merely giving opinions about prior proof, the Sixth Circuit accepts evidence as "new," for *Schlup* purposes, when it was not previously presented at trial.  *See Hubbard v. Rewerts*, 98 F.4th 736, 743 (6th Cir. 2024) ("While the Supreme Court has not explicitly defined what evidence counts as "new," this court has held that evidence is "new" for the purposes of the actual-innocence inquiry so long as it was not presented at trial. *Souter*, 395 F.3d at 595 n.9 (citing *Schlup*, 513 U.S. at 324, 115 S.Ct. 851); *Freeman v. Trombley*, 483 F. App'x 51, 57 (6th Cir. 2012)."). Similarly, a new affidavit filed by a doctor calling into question previous expert opinions made at trial has been treated as new evidence, for these purposes. In *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 427 (6th Cir. 2003), the Sixth Circuit considered an affidavit filed during a habeas proceeding, which opined that expert trial evidence supporting the previous conviction could not be made with reasonable medical certainty, and thus, the experts wrongly testified at trial. The court found that the evidence was not sufficient to demonstrate that it was "more likely than not that a reasonable juror would not have convicted"

the defendant in light of this evidence, but found that the opinion was still "new," even though it relied on previously presented evidence. *See id.* The post-mortem authorization record, not even in Harris's hand until over a decade later, obviously was not used at trial and also is new.

Although the proof is new, the Court finds it, as Judge Stinnett did, plainly insufficient to meet the *Schlup* standard, one of the highest under the law. The Court has surveyed the full trial record, considered the testimony of the witnesses, and then added for assessment the new proof, including any incriminating aspects. For a proper analysis, the Court must gauge it all against the *Schlup* test. *See McCray*, 2024 WL 3443413, at *9 ("When making that determination, the court must consider 'all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial.' *House* [*v. Bell*], 547 U.S. 518, 538 (2006).").

Harris's own words well substantiate the conviction. This all comes from Day 2, Disk 3, during Harris's direct and cross (10:16–11:07). Though he testified to no memory of key parts of the fateful interaction with Kirtley, he conceded to ending up on top of her on the ground. He "wrapped around" some part of Kirtley's body, holding her for "four to five minutes" until she had ceased any struggle. He could not remember what body part he immobilized. He admitted contact with her throat, when tackling Kirtley, in a statement to detectives. Even after he had immobilized her for that length, and when she lay motionless, Harris stood watching her for "about two minutes." He felt no pulse on her arm and only "something" on her neck; he "didn't know" if she was dead or not. He admitted telling witness Ayers on the scene that he didn't know if she was dead or alive. Critically, he conceded he told Ayers he "could have smothered her" or that "he smothered her." In a disturbing and inexplicable coda, Harris stole Kirtley's shoes as he left the apartment.

Ayers, who reported the incident to police, testified with credibility and consistency.  Day 1, Disk 2, 9:30–10:25.  He said when Harris alerted him in the next room, Harris relayed he had "killed" Kirtley.  Harris pointed to his neck when saying he killed her.  Ayers, then in the room, saw Kirtley with a pillow or blanket covering her face.  He said Harris remarked on his frustration with female "games," and said he had suffocated or strangled Kirtley.  Harris testified he had twisted Kirtley's neck "to make sure" she was dead.  Harris "had to get something" from Kirtley and left with her shoes.

Dr. Stephens, medical examiner, testified in support of his autopsy report and analyzed the death.  He faced full and active cross-examination.  The Court has reviewed the trial record with respect to that testimony.  Although Stephens pointed to likely manual strangulation, he relayed the death as caused by asphyxia, noting the various ways that could occur, but pointing, for particular physiological reasons he observed, to his view on manual strangulation.  He also confirmed a neck injury corroborative of the twisting or torsion that Ayers relayed.  Dr. Parrott, called for the defense, agreed that strangulation was the death cause, though he differed on the likely type of or mechanics of strangulation involved.

The new proof does little to weaken the state's case and does not establish that, given the added proof, no reasonable juror would convict.  On the post-mortem authorization form, the Court notes several issues.  First, the stated time of death is listed merely as an approximation.  The author was either a coroner or deputy coroner.  Nothing in the record indicates the credentials or expertise of the author.  Nothing indicates the basis for or reason for including that approximation. No analysis or empirical foundation appears. The whole point of the post-mortem authorization was to secure, as required by KRS 72.025, an expert view on the circumstances of Kirtley's death; the administrative form, which Stephens had nothing to do with completing, offers only the

slimmest of reeds in terms of weight.  Further, the form also contains incriminating remarks, attributing to the "1st male": "I think she is dead." DE 26-2 at 404.  Time of death was not a subject addressed by either Stephens or Parrott, and there is no fair doubt that Kirtley died at the time and at the scene of the altercation.

Dr. Young's short letter also fails to establish actual innocence.  Again, nothing, besides letterhead inferences, suggests Dr. Young's qualifications.  He purports to have reviewed some materials that Harris supplied, but the field of review is indeterminate.  For example, a letter from Harris influenced Young, but the letter is not disclosed.  Young's views essentially screened Harris's versions of the night (oddly, as told to the police and as divergently told to Young) and deemed them both somehow consistent with the autopsy findings.  He opined that the physical observations by Stephen showed "no autopsy evidence of strangulation or neck torsion," even though his conclusions in no way discounted the consistency between Stephens's determinations and what the autopsy stated.  Young viewed cardiac arrest from the struggle as a possible cause of death.  Interestingly, though Harris's version at all times included a prolonged physical struggle with Kirtley, in which he physically restrained and rendered her unresponsive after several minutes of restriction, Young repeatedly opines that autopsy elements (such as hemorrhages in the neck and blood extravasations in the posterior neck structures) would be consistent with death by natural causes.  Young gave no opinion and did not reference time of death.

Young's proof would offer downsides as well, which would include yet another version of the event by Harris.  In the letter, Young summarizes Harris's claim that Ayers "commanded we leave the victim there" and that Harris had "checked her wrist and . . . felt a pulse."  These elements conflict with Harris's other tellings and offer another set of cuts against Harris's credibility.

10

As *Rewerts* stressed:

> Fifth, and perhaps most importantly, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (citing *Sawyer v. Whiteley*, 505 U.S. 333, 339, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992)). And in the "gateway" context, our court has said the same thing. . . . This means that a petitioner may not pass through the equitable gateway by simply undermining the state's case. Rather, he must demonstrate that he *factually* did not commit the crime. Of course, dismantling the state's case is *relevant* and *helpful* to the petitioner because it leaves a vacuum to be filled by an exonerative explanation; but it is not sufficient in and of itself. This distinction between exonerating evidence and impeachment evidence undergirds both of the Supreme Court's landmark equitable-exception cases.

*Rewerts*, 98 F.4th at 743.   By offering proof that, at most, would thinly offer a "possible" alternative cause of death and generic methodological criticism—this against a record where two qualified pathologists testified at length in reaching the asphyxia by strangulation view—Young's evidence would, at the most, marginally undermine the Commonwealth's proof.[3]   In this case, Harris intentionally restrained Kirtley for a lengthy period, rendering her unresponsive.   He then watched her at length, seeing no movement.   He told his friend, a man like a brother, that he had smothered or strangled Kirtley and that he killed her, pointing to his neck.   As a parting injury, he stole Kirtley's shoes.   Significant medical and expert proof corroborates the Commonwealth's version, including Harris's post-restraint neck twist, to ensure Kirtley had expired.   Harris has not proven, under the *Schlup* formulation, that no reasonable juror would convict him.   *See also Gulertekin*, 340 F.3d at 427 (describing new counter-proof critical of prosecution experts at previous trial as "opinions [that] merely undermine this testimony, and do not" meet *Schlup*).

### b.  Harris's *Brady* Claim

Judge Stinnett separately analyzed Harris's *Brady* claim, on the merits. *See* DE 37 at 10–18. Harris contends that the Commonwealth suppressed the post-mortem authorization, which listed the approximate time of death.  According to Harris, at the time of trial, the jury asked about

---

[3] And, as the Commonwealth argues, Dr. Parrott himself had plowed significant parts of this ground in his testimony.

11

the time of death. His own trial counsel stated that he did not know the time of death, and the Commonwealth said there was not a time of death. *See* DE 37 at 7.   Harris argues the approximation is material because it supports a theory that Kirtley was alive when he left the residence.

In response, the Commonwealth argues: (1) that the form is merely an authorization that would have been completed prior to any scientific analysis or autopsy; (2) Harris failed to show willful or inadvertent suppression, as neither party was aware of any time of death at the time of trial; and (3) the authorization form was available to Harris and his counsel at the time of trial through a public records request. *See* DE 26 at 28–29.

In order to show a *Brady* violation, Harris must show that "(1) the evidence was favorable to him, (2) the prosecutor withheld the evidence, and (3) he suffered prejudice, which means that the suppressed evidence is material either to his conviction or his sentence." *Jones v. Bagley*, 696 F.3d 475, 486 (6th Cir. 2012) (citing *Strickler v. Green*, 119 S. Ct. 1936, 1947–48 (1999)). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 119 S. Ct. at 1948 (quoting *United States v. Bagley*, 105 S. Ct. 3375, 3383 (1985)). The Sixth Circuit has continuously found that if the relevant information was available to the defendant from a source other than the state, then the *Brady* analysis does not apply. *See United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991) (internal citations omitted) ("No *Brady* violation exists where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information,' . . . or where evidence is available to the defendant from another source[.]"); *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998); *Spirko v. Mitchell*, 368 F.3d 603, 611 (6th Cir. 2004); *Matthews v. Ishee*, 486 F.3d 881, 890–91 (6th Cir. 2007); *Bell v. Bell*, 512 F.3d 223, 236 (6th Cir.

12

2008). The authorization form, extant at the time but not in the prosecution's hands, likely was available through a public records request—that is exactly how Harris obtained the document in 2021. Harris makes no showing that anything prevented him or his counsel from securing the ministerial form prior to his trial. This alone would preclude a *Brady* claim. [Notably, neither side made an issue of time of death at trial, which suggests that the case hardly turned on specifying that point.]

Judge Stinnett treated default of the claim as excused because *Brady* is the subject matter. *See* DE 37 at 12.   The Commonwealth cites *Henness v. Bagley*, 644 F.3d 308 (6th Cir. 2011) and demurs.  Thus, Harris discovered the form and did raise the matter to the state court, via a Rule 60.02 motion.  However, he did not see that through to exhaustion, failing to effect an appeal timely.  The Kentucky Court of Appeals rejected Harris's effort at belated appeal.  *See* DE 26-2 at 467–68.  The *Brady* matter did not produce this default, at least, not the appeal failure.  However, because the Commonwealth did not object to Judge Stinnett addressing the merits, the Court here will forge on to materiality.

The Court already fully discussed the value and potential impact of the post-mortem authorization, explaining its lack of probative force.  The ministerial form, completed by an author of  unknown  qualifications  following  an  unspecified  process,  merely  is  part  of  the  legal groundwork for autopsy authorization.  The form contains inculpatory information (including an alleged  confirmation  regarding  Harris's  knowledge  of  death  at  the  scene)  and  only  an approximation, in a vacuum, regarding time of death.  Harris, who certainly expressed in the moment that he thought or worried he had killed Kirtley, confirmed she was fully unresponsive, found no pulse in her extremities (with an ambiguity as to her neck), and left her dead or for dead with no 911 call, seeks to use a stray temporal reference in a ministerial document to undermine

the verdict.  Notably, again, his own new expert, Dr. Young, says nothing supportive of a time-of-death theory, only agreeing that the struggle may have caused a heart attack rather than a death by asphyxiation. The procedural document, if known and circulated to all, does not introduce a reasonable probability of a different result, and the Court sees nothing to undermine its confidence in the outcome of trial.  In a trial involving multiple qualified pathologists, none of whom produced or analyzed time of death as a factor of consequence, the Court rejects the thin *Brady* argument built on the autopsy paperwork, which is merely a bureaucratic predicate to expert examination on the particulars and circumstances of death.[4]

## IV.    Conclusion

Accordingly, except as modified in this decision, the Court **ADOPTS** DE 37 and **DENIES** DE 1, Harris's § 2254 Petition. A Judgment to this effect follows. The Court finds that Judge Stinnett properly denied an evidentiary hearing; the record and claims presented did not warrant a hearing under the standards of habeas Rule 8 and §§ 2254 & 2243.

The Court also denies a certificate of appealability, under § 2253(c)(2) and habeas Rule 11. Harris has not made a substantial showing of the denial of a constitutional right.  To warrant a COA, on a procedural or substantive issue, the petition must "show[] that reasonable jurists could debate" the correctness of writ denial.  *Mitchell v. United States*, 43 F.4th 608, 614 (6th Cir. 2022) (citing and quoting *Slack v. McDaniel*, 120 S. Ct. 1595, 1603–04 (2000)).  The Court **DENIES** a certificate of appealability.  "To put it simply, a claim does not merit a certificate unless *every independent reason to deny the claim is reasonably debatable*."  *Moody v. United States*, 958 F.3d

---

[4] Jury notes come from a secret, deliberating body, and are largely inscrutable, in the Court's experience.  A jury asking a question does not mean every piece of theoretical proof touching on that subject matter is material under *Brady*.  Here, the Court looked at the query in context.  The matter arose on Day 3, around 3:27 on the tape.  There was not a note from a deliberating jury.  Rather, one juror apparently passed a note to the trial judge in the hall, and the judge simply communicated it to the parties for their information going forward.  The proof was not yet closed. Neither party expressed a known answer, and the issue ended there, as far as the court's involvement.  A stray juror's question, mid-trial, is an even leaner indication of impact in the overall calculus.

485, 488 (6th Cir. 2020).  Nearly all of Harris's case is time barred, and his *Brady* claim, if otherwise cognizable, is without merit.  Harris does not meet the COA standard.

Finally, the Court **DENIES** DE 52 and DE 53.  As to DE 52, Harris had a full and fair opportunity to brief all issues.  The Court sees no justification for allowing in or considering extraneous policy documents that, at most, reflect the views of the DOJ and certain science groups at a time far removed from the Harris trial, which occurred in 1999 and involved a court in the Commonwealth.  Further, given the writ denial, the request for release pending a ruling clearly is moot.

This the 15th day of October, 2024.

**Signed By:**

**_Robert E. Wier_**

**United States District Judge**